UNITED STATES *v.* J. J. GAVIN & Co. (No. 3901)[1]

United States Court of Customs and Patent Appeals, January 27, 1936

*Joseph R. Jackson,* Assistant Attorney General (*Charles D. Lawrence,* Special Assistant to the Attorney General, and *Marcus Higginbotham, Jr.,* special attorney, of counsel), for the United States.

*Brown & Carter* (*Allan R. Brown, Fred J. Carter,* and *Eugene F. Blauvelt* of counsel) for appellee.

[1] T. D. 48164.

[Oral argument December 6, 1935, by Mr. Lawrence and Mr. Blauvelt]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

BLAND, Judge, delivered the opinion of the court:

Certain pile fabrics, represented by Exhibits 1 and 2, were imported at the port of New York in the year 1932 and were classified by the collector as dutiable under paragraph 909, Tariff Act of 1930, at 62½ per centum ad valorem as velvets. The classification of the collector under said paragraph 909 was by virtue of the terms of paragraph 1122 of the same act.

The importer protested the said classification and claimed that the goods were dutiable at 50 per centum as plushes under the same paragraph. Other claims were made in the protest but are not pressed here.

The United States Customs Court, First Division, sustained the protest, and from the judgment of said court the Government has appealed here.

Paragraph 909 of the Tariff Act of 1930 reads as follows:

PAR. 909. Pile fabrics (including pile ribbons), cut or uncut, whether or not the pile covers the entire surface, wholly or in chief value of cotton, and all articles, finished or unfinished, made or cut from such pile fabrics, all the foregoing, if velveteens or velvets, 62½ per centum ad valorem; if corduroys, plushes, or chenilles, 50 per centum ad valorem; if terry-woven, 40 per centum ad valorem.

The merchandise represented by Exhibits 1 and 2 is upholstery material, each exhibit being of substantially the same weight. The pile is partly cut in Exhibit 1 and wholly uncut in Exhibit 2.

The sole issue in the case is whether or not the collector erred in assessing the merchandise under said paragraph as velvets rather than under the same paragraph as plushes.

The record contains much testimony—that of nine witnesses for the importer and five for the Government. Importer's witnesses testified that the merchandise was not velvet. Most of said witnesses stated that it was plush. Some of them stated that both exhibits were friezes and in some instances, in referring to Exhibit 2, used the term "Epingle frieze". In general, the witnesses distinguished plush from velvet by stating that if it was a very fine texture it was velvet; otherwise it was plush.

We think the testimony of two of the importer's witnesses, together with certain catalogues introduced in evidence, show that notwithstanding the fact that goods like those at bar were not known to be velvets by those who sold them, they were nevertheless frequently sold as velvets for the reason that they could get more money for them if they were sold as velvets rather than as plushes. The Government points out that in one of the catalogues of Stroheim & Romann, the importer in this case, merchandise like that at bar was

styled "frieze velvet". Appellee's witnesses Hirsh and Oliver were not connected with the importer in this case but testified that goods similar to the imported material here were sold by the firm with which they were connected as some kind of velvet rather than plush although they knew it was plush at the time it was sold.

At least two of the Government's witnesses testified that the merchandise was velvet. One of the witnesses, Edward J. Burke, testified that he was connected with the Orinoka Mills who manufacture and sell upholstery and drapery fabrics; that he was formerly connected with the importer, Stroheim & Romann; that he purchased Exhibit 1 as cut and uncut friezes and Exhibit 2 as uncut friezettes and sold them under the same names, friezes and friezettes, friezettes being the uncut and friezes being the cut and uncut. He also testified that they were sold as cut and uncut velvets; that during the time he worked for Stroheim & Romann and with his present employers he never knew these articles to be sold as plushes; that the construction of the fabric in Exhibits 1 and 2 is the construction of uncut velvet.

Government witness Percival B. Baldwin stated that in his experience such goods were not offered to the wholesale trade as plushes but that merchandise like Exhibit 1 was offered as a cut and uncut frieze and Exhibit 2 as a plain frieze. He said that the plushes which his company manufactured were high-pile fabrics—pile at least one-half inch high—used in the coating and cloak trade, and that in his experience he never heard the term "plush" used in the upholstery trade.

Government witness Frank R. Wheeler, connected with the Rossie Velvet Co., manufacturers and sellers of velvets, stated that merchandise like Exhibit 1 was sold by his company as a "cut and uncut frieze upholstery velvet" and that which was like Exhibit 2 as a "stria frieze upholstery velvet"; that merchandise like either Exhibit 1 or Exhibit 2 was not a plush.

Government witness, Albert Kaupe, testified that he was connected with A. F. Schumacher & Co., manufacturers of fabrics for the upholstery and decorative trade; that he never offered merchandise like Exhibits 1 and 2 for sale as plushes but as friezes; that his firm does not handle plush but handles only velvets, velours, and friezes, and that he sold merchandise like Exhibits 1 and 2 as friezes, but called them velvets—velours. He also testified that he had "a thing which imitates a fur which is a pile fabric, and which we call plush".

The fifth Government witness, John J. Repp, Jr., connected with the Collins & Aikman Corporation, who produce and sell pile fabrics, stated that Exhibit 2 was a plain frieze velvet made without a Jacquard attachment and that Exhibit 1 is made with a Jacquard attachment and is a "cut and uncut frieze velvet".

We find the following definitions of the terms "velvet" and "plush" in Webster's New International Dictionary, 1932:

*velvet.* 1. A *silk* fabric having a short close nap of erect threads forming a thick soft pile. It is called pile velvet when the loops of the pile are uncut, and cut velvet when the loops are cut so that the pile is of single threads. Inferior qualities are made with a silk pile on a cotton or linen back. [Italics ours.]

*plush.* 1. A textile fabric with a nap or shag on one side, longer and softer than that of velvet. It is made of silk, cotton, wool, etc., or combination of two materials.

In the Summary of Tariff Information, 1929, Vol. 2, page 1572, which was before the Committee on Ways and Means, House of Representatives, when the tariff act under consideration was being prepared, is found the following information pertinent to the cotton pile fabric paragraph:

* * * Plushes and velvets are usually woven as double fabrics; that is, as two fabrics, one above the other, connected by the alternate interlacing of warp pile threads which are cut on the loom so as to leave each fabric with its own pile. The term plush implies a longer pile than the term velvet. Some imported cotton velvets are woven over wires. Cotton plushes are used for cloaks and millinery and for show-window decorations. Cotton velvets are used in millinery and for lining jewelry boxes and silverware cases. Terry-woven cloths are made on looms with a special reed motion and warp easing arrangement, * * *.

The Government in its brief states when consideration is given to "all the competent, material and convincing evidence" and when it is given "its due and proper value, that the *weight of evidence clearly shows* that the articles involved *are not* 'plushes'". [Italics quoted.] It is pointed out by the Government that the record shows that although the importer and others referred to by appellee's witnesses, regarded the merchandise as plush, they nevertheless sold it to the public as velvet. As we understand this contention of the Government, it is to the effect that if the merchandise was in fact plush but was held out and sold to the consuming public in this country as velvets, it should be so regarded for tariff purposes. This can hardly be regarded as a contention that the evidence as a whole makes out a case of commercial designation. The trial court, in an opinion by Judge Brown, stated that "No commercial designation to the contrary is made out, though attempted". We agree with the trial court that it was not shown that merchandise like that at bar, was, on the date of the passage of the tariff provision under consideration, generally and uniformly known throughout the trade in the United States as velvet. If there was any attempt to show commercial designation it was by the testimony which shows that merchandise which the importer and its witnesses say was plush was in fact sold as velvet.

Since the record shows, we think, that the imported merchandise at bar is plush, the fact that the importer and others, knowing that such goods were plush, may have sold the same as velvet cannot,

under any sound principle of law with which we are familiar, justify a holding that they should be classified as velvet. Without deciding or discussing the question as to whether or not this court in a protest proceeding may make application of the doctrine of unclean hands, we hold that this record affords no proper basis for the application of such doctrine. It is not even remotely suggested that the importer's conduct in respect to the transactions between itself and the Government which are here in controversy was such as would make applicable said doctrine. As was said in *Camors-McConnel Co.* v. *McConnell*, 140 Fed. 412, 417:

Courts will not refuse redress to the suitor because his conduct in other matters, not then before the court, may not be blameless. It is enough, if the suitor shows he has acted justly, fairly, and legally in the subject-matter of the suit.

See also Bispham's "Principles of Equity", tenth edition, section 42, at page 72.

Government counsel, while not contending that commercial designation had been established, stated that they believed that under the proof the trial court was in error in sustaining the protest of the importer and holding the involved merchandise to be plushes in view of the decision of the Circuit Court for the Southern District of New York entitled *Charles Morningstar & Co.* v. *United States* (*two cases*), 159 Fed. 287. These cases involved the question as to whether the imported material then at bar was starch or "dextrine" and the inapplicability here of the decision in those cases may be readily discerned from a reading of a single paragraph in the decision which is as follows:

Mr. Morningstar has been the sole importer of this particular article for a great many years, extending back far beyond the present tariff act. He has imported it until lately as dextrine, and paid duty under paragraph 286. The burden of proof is, of course, upon the Government to prove a commercial designation which should govern the rate. I think this burden has been sustained, and, upon the entire record, it is plain that the merchandise was definitely, generally, and uniformly known in the trade of this country as "dextrine" when the act of 1897 was passed. The importer himself says in flat terms that it was so known, but he insists that such designation was erroneous, and cannot be borne out scientifically. As the sole importer of this special brand he helped to fasten the trade-name upon it; as a selling point he may have supplemented the general name with some special mark or stamp, but the general name by which it was known still remained uniform and definite. In truth, even as a selling point, one at least of his fancy names seems to have failed of efficacy.

It is our view that the *Morningstar* cases have little, if any, relevancy to the issue at bar as presented by the instant record which obviously is wholly different from the one involved in said Circuit Court cases.

The importer on this phase of the case cites and discusses *Glickman* v. *United States*, 11 Ct. Cust. Appls. 151, T. D. 38946. We quote from the syllabus:

It was shown that importer's principal witness, who was his daughter and business manager, had customarily encouraged customers who rented models of women's wearing apparel to believe that they were getting originals and not copies. The witness admitted this, but testified that the originals had remained at all times in importer's manufacturing establishment. This proof of bad faith and her interest in the business go to her credibility, of course, but did not justify the Board of United States General Appraisers in rejecting as untrue whatever she testified; and her statement that the models had not been out of importer's manufacturing establishment, not having been contradicted when there was abundant opportunity to do so if it were false and having been corroborated by proven relevant circumstances, should not have been thrown out.

While there may have been some similarity between certain features of the *Glickman* case, certainly it is not controlling of decision of the issue here presented. It does go so far as to hold that the witness' treatment of her customers might throw some light upon her character but that it did not justify the board in rejecting her undisputed testimony.

During the argument of this case attention was called to the fact that the dictionary defines velvet as a silk fabric whereas in the instant case the merchandise contains no silk whatever, and was classified as dutiable under the cotton schedule. It seems clear to us that the Congress understood that in the commerce of this country velvets and plushes did not necessarily contain silk since we find in paragraph 909 that provision is made for pile fabrics which may consist of velvets and plushes "wholly or in chief value of cotton".

While proof of common meaning of a term used in the statute is not binding upon the court, it usually is, as here, quite helpful and we think that the testimony in this case and all other considerations above referred to fully justified the trial court in concluding that the imported merchandise consisted of plushes. It, therefore, properly sustained the protest, and its judgment is *affirmed*.

HATFIELD and LENROOT, Judges, dissent.